1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8
9
10
11
12

UNITED STATES OF AMERICA,

                Plaintiff,

v.

GHASSAN HADDAD,

                Defendant.

No. CR05-0071P

FINDINGS OF FACT AND
CONCLUSIONS OF LAW
REGARDING DEFENDANT'S
MOTIONS AND KASTIGAR
HEARING

13
14
15
16
17
18
19
20
21
22
23
24
25
26

This matter comes before the Court on Defendant Ghassan Haddad's Motion to Suppress Evidence Seized Pursuant to Search Warrant (Dkt. No. 77) and Defendant's Motion to Dismiss All Charges or, Alternatively, to Suppress Statements and Other Evidence (Dkt. No. 78-1). This Court has reviewed the Government's response to these motions, Defendant's Reply, and all relevant papers and exhibits in this case. Additionally, the Court has read both of the United States' supplemental Kastigar hearing memoranda (Dkt. Nos. 92-1 and 104), as well as Mr. Haddad's Memorandum of Law Regarding Interpretation of Immunity Agreements and Argument Regarding Mr. Haddad's Immunity Agreement (Dkt. No. 98). On March 13, 14, 22, and 24, 2006, the Court heard testimony and oral argument in this case. First Assistant U.S. Attorney Mark Bartlett represented Plaintiff United States, while attorney Peter Camiel represented Defendant Ghassan Haddad. During the hearing on this matter, the Court heard testimony from AUSA Andrew Hamilton of the Seattle U.S. Attorney's office, AUSA Andrew Friedman of the Seattle U.S. Attorney's office, AUSA C. Andrew Colasurdo of the Seattle U.S. Attorney's office, ATF Special Agent Mark Stites, FBI Agent Rich Conte, who was a member of the Joint Terrorism Task Force ("JTTF"), JTTF Special Agent Thomas

1   McCartney, ATF Special Agent Monique Villegas, AUSA David Atkinson of the Portland U.S.

2   Attorney's office, FBI Special Agent Richard Holden, ATF Special Agent Brian Downey, and

3   Defendant Ghassan Haddad.  Having considered all relevant papers and pleadings, as well as

4   testimony by the witnesses listed above, and oral argument by the parties' attorneys, the Court makes

5   the following findings of facts and conclusions of law:

6                                   FINDINGS OF FACT

7   1.      Shortly after September 11, 2001, law enforcement agents in Portland, Oregon, heard from a

8   confidential informant that a group of about 30 people, including Ali Khalid Steitiye, had practiced

9   shooting weapons at a gravel pit in southwest Washington.  The confidential informant stated that

10  Ghassan Haddad had provided Mr. Steitiye with an automatic weapon.  The confidential informant

11  received this information from Mustafa Chanine, who was a friend of Mr. Steitiye's.

12  2.      According to Mr. Haddad, he met Mr. Steitiye and Mr. Chanine in 2001 at a gun show.  They

13  met because Mr. Haddad, who was born in Lebanon, noticed that they were speaking Arabic and

14  addressed them in Arabic, which is his native language. At this time, Mr. Haddad gave them a card

15  with his address and telephone number in Seattle.

16  3.      On at least five occasions between this gun show and when Mr. Steitiye was

17  arrested on October 24, 2001, Mr. Steitiye traveled from Portland to Seattle to see Mr. Haddad and

18  discuss a prospective weapons purchase with him.

19  4.      Mr. Chanine accompanied Mr. Steitiye on at least two of these trips and bought a Makarov

20  handgun from Mr. Haddad for two-hundred dollars.

21  5.      In a Grand Jury hearing on December 15, 2003, Mr. Haddad testified that on the first trip,

22  Mr. Steitiye did not buy or borrow any weapons from Mr. Haddad.  On the second trip, Mr. Haddad

23  loaned Mr. Steitiye a Chinese semi-automatic .223 caliber AK-47.  Mr. Steitiye did not pay Mr.

24  Haddad a security for the loan of this weapon.  Mr. Steitiye was not satisfied with this gun and made

25  another visit to Seattle to return it to Mr. Haddad a few weeks later.  On this visit Mr. Haddad loaned

26  Mr. Steitiye a 7.62 caliber side-folding AK that he built. This weapon had the capability to fire in both

ORDER - 2

semi-automatic and fully automatic mode.  He did not charge Mr. Steitiye any money for this weapon, nor collect a security from him.  This second weapon malfunctioned and Mr. Steitiye made yet another visit to Mr. Haddad to return this weapon.  On this visit Mr. Haddad loaned Mr. Steitiye his own personal fully automatic 5.45 by 39 millimeter caliber weapon. Again, Mr. Haddad did not collect a security or any payment from Mr. Steitiye for this weapon.  Mr. Steitiye tried this weapon but decided that it was too expensive.  He returned it to Mr. Haddad on a final visit and Mr. Haddad gave him a semi-automatic Romanian-made 7.62 by 39 caliber weapon to try out.  Mr. Steitiye notified Mr. Haddad by telephone that he would like to buy the Romanian gun and they made arrangements to meet up at an upcoming gun show.  Mr. Steitiye was arrested before he could pay Mr. Haddad.

6.      Mr. Haddad had given essentially the same information as that to which he testified before the Grand Jury to federal investigators on May 30, October 30, and November 14, 2003.  The only material difference between Mr. Haddad's testimony on these occasions is the fact that Mr. Haddad did not admit on May 30 and October 30, 2003 to having provided Mr. Steitiye with automatic weapons in 2001.

7.      When Mr. Steitiye was arrested, law enforcement found the Makarov handgun and the semi-automatic Romanian weapon that Mr. Haddad had provided in Mr. Steitiye's car.

8.      On February 2, 2002, ATF Agent Mark Stites made an undercover purchase of an AK-74 parts kit from Ghassan Haddad at the Puyallup, Washington, gun show.  This undercover purchase was made in connection with an ongoing investigation into the criminal activities of Mr. Steitiye in Portland and his connection to an alleged terrorist group known as the "Portland 7."

9.      On May 30, 2003, Agent Stites and Special Agent Richard Conte approached Mr. Haddad while he was walking in his neighborhood in Federal Way, Washington.  They identified themselves and asked if he would talk to them regarding his relationship with Mr. Steitiye.  Mr. Haddad assented.

10.     During this interview, Mr. Haddad admitted to having provided Mr. Steitiye with semi-automatic weapons but withheld the fact that he had also provided fully automatic weapons to him.

11.     On October 30, 2003, ATF Agent Monique Villegas and JTTF Agent Thomas McCartney traveled to Seattle from Portland in order to talk with Mr. Haddad about Mr. Steitiye and to serve him with a Grand Jury subpoena relating to Mr. Steitiye's case.  Upon arrival in Seattle, they met Agent Stites who showed them where Mr. Haddad lived and accompanied them during the interview.

12.     Upon arriving at Mr. Haddad's home, the agents identified themselves to Mr. Haddad and asked to talk to him about Mr. Steitiye.  Again, Mr. Haddad agreed to talk to the agents.  Mr. Haddad gave the agents essentially the same information that he had given to Agents Stites and Conte five months previously.

13.      During the course of this meeting, one of the agents told Mr. Haddad that it was a crime to lie to federal agents.

14.     At the end of the meeting Agent McCartney served Mr. Haddad with the Grand Jury subpoena for the U.S. District of Oregon.  Mr. Haddad expressed some fears that he was in trouble. Agent McCartney testified that he assured Mr. Haddad that as long as he told the truth, he would not get into trouble.

15.     On November 14, 2003, Mr. Haddad went to Portland to testify before the Grand Jury regarding his relationship with Mr. Steitiye.

16.     Upon arrival at the Portland U.S. District Courthouse, Mr. Haddad met with AUSA David Atkinson, Special Agent Villegas and Special Agent McCartney.  They reviewed Mr. Haddad's potential testimony with him.  During this meeting, Special Agent Villegas confronted Mr. Haddad with the fact that the Government suspected that he was lying about not having provided Mr. Steitiye with automatic weapons.

17.     Before going any further with this meeting, Mr. Haddad asked for protection.

18.     AUSA Atkinson and Agents Villegas and McCartney exited the room where Mr. Haddad was and met in the hallway.  AUSA Atkinson testified that he made a call to AUSA Hamilton in Seattle to ascertain whether a grant of immunity by the Portland U.S. Attorney's office would hamper the Seattle investigation into Mr. Haddad's activities.  AUSA Atkinson testified that he was told that a

grant of immunity would not affect the Seattle investigation because Mr. Haddad was not the target of that investigation.  AUSA Hamilton had no clear recollection of the substance of this conversation.

19.     AUSA Atkinson returned to the room where Mr. Haddad was.  AUSA Atkinson made oral representations to Mr. Haddad that any statements he made regarding Mr. Steitiye would be protected.

20.     AUSA Atkinson testified that he intended for this protection to only cover the statements that Mr. Haddad made to him on November 14, 2003.  Mr. Haddad testified that he understood this agreement to mean that any statements that he had previously made to investigators regarding Mr. Steitiye were also protected.

21.     Mr. Haddad admitted that he had provided Mr. Steitiye with automatic weapons.   The United States concedes that any statements made during the meeting on November 14, 2003, are protected by an informal immunity agreement.

22.     AUSA Atkinson did not give Mr. Haddad written documentation regarding the scope of the immunity he extended to Mr. Haddad on November 14, 2003.  AUSA Atkinson testified that he did not specifically tell Mr. Haddad that the statements he had previously made to investigators were not covered by this agreement, nor did he specifically tell Mr. Haddad that other districts could use his statements to prosecute him.  Special Agent McCarthy remembered no explicit warnings to Mr. Haddad and confirmed that he remembered just the opposite--that prior statements to investigators regarding Haddad's relationship with Mr. Steitiye would be covered by the immunity agreement. Citing to the Kastigar hearing transcript, Mr. Haddad points out in his Memo of Law that "Agent McCarthy [sic] was asked, 'Wasn't Mr. Haddad told that statements he made to investigators about his relationship with Mr. Steitiye would be covered by the immunity?' Answer: 'Yes sir.'" (Dkt. No. 98 at 9, ln. 3-4). Mr. Haddad also testified that he received no warnings that his earlier statements were not covered.  In her report detailing the meeting of November 14, 2003, with Mr. Haddad, ATF Agent Monique Villegas wrote, "AUSA Atkinson admonished HADDAD (and several times throughout the interview) that his agreement did not preclude any other ongoing criminal

ORDER - 5

1

investigations made by this or any other jurisdiction.  AUSA Atkinson indicated that the agreement

2

was limited to the statements made by HADDAD regarding firearms transactions between he and

3

STEITIYE divulged to investigators during that interview." (Def's. Ex. 2).  Agent Villegas' report is

4

dated November 25, 2003–two weeks after the interview took place.  Because this report was not

5

drafted contemporaneously with Mr. Haddad's interview on November 14, 2003, and because AUSA

6

Atkinson, Agent McCartney, and Mr. Haddad all testified to a different recollection than that

7

captured in Agent Villegas' report, the Court resolves the inconsistency in the evidence and testimony

8

and finds that Mr. Haddad was given no warnings that he could be prosecuted in other districts or the

9

fact that prior interviews with federal agents were not covered by the agreement.

10

23.     Mr. Haddad was unrepresented by counsel at the November 14, 2003, meeting.

11

24.     Mr. Haddad did not give substantive testimony to the Grand Jury on November 14, 2003.

12

Instead, he was told to return on December 15, 2003.

13

25.      On December 5, 2003, Special Agent McCartney traveled from Portland to Seattle to deliver

14

an immunity letter to Mr. Haddad.

15

26.     The text of the immunity letter reads, in pertinent part:

16

           [t]his letter will set forth the agreement reached between you and this district
regarding information which will be provided by you to a grand jury and to law

17

enforcement officers conducting an investigation regarding Ali Khaled Steitiye.  You
have agreed to provide complete and truthful answers to all questions asked of you

18

regarding Mr. Stetiye [sic.] and his alleged possession of firearms during the fall of
2001.  This district agrees to provide you with all of the protection which would be

19

provided to you under a formal court-ordered grant of immunity pursuant to the
provisions of 18 U.S.C. §§6002 and 6003.  No testimony or other information

20

provided by you, or any information directly or indirectly derived from that testimony
or other information, will be used against you in any criminal case, except in a

21

prosecution for perjury or giving a false statement.  It is further understood that this
immunity agreement applies to any information which might be provided by you before

22

a grand jury, a trial jury, or in other proceedings relating to this investigation.

23

           The scope of this agreement applies only to information that you provide as
set forth above.  The questions posed to you by investigators and the grand jury will

24

be limited and focused. This agreement does not apply to any other matters not
reflected in this document.

25

(Def's Ex. A-1).

26

27.     Agent McCartney testified that Mr. Haddad signed the letter and expressed to him that he

was worried.  Agent McCartney reassured Mr. Haddad again that his statements would not be used against him if he told the truth.  Mr. Haddad's testified that he understood the immunity letter and Agent McCartney's assurances to include his statements to federal investigators on May 30, October 30, and November 14, 2003, as well as his prospective testimony before the Grand Jury.

28.       On December 15, 2003, Mr. Haddad testified before the Grand Jury in Portland concerning all of his contacts with Mr. Steitiye.  During this testimony, Mr. Haddad admitted that he had provided Mr. Steitiye with semi-automatic and automatic weapons.  Based in part on Mr. Haddad's testimony, the Government obtained an indictment against Mr. Steitiye.

29.       From approximately the year 2000 until 2005, the Seattle United States Attorney's office was coordinating a separate and concurrent investigation into alleged arms trafficking offenses involving Keith Gilbert, Sergey Zarodnyuk, and Ghassan Haddad.

30.       Agent Richard Holden testified that around January 2004, a meeting was held at the Seattle U.S. Attorney's Office to discuss the immunity given to Mr. Haddad by the Portland U.S. Attorney's Office regarding the Steitiye case.  A decision was reached to move forward with the Seattle investigation despite the immunity agreement.  Agents Holden and Downey were present at this meeting, as well as AUSA Hamilton and several other Assistant U.S. Attorneys from the Seattle office.  During their testimony, neither Agent Holden nor Agent Downey appeared to the Court to have a clear understanding about what types of evidence fell under the protection of Mr. Haddad's immunity agreement with the Government.  This view is supported by the agents' testimony that the immunity granted to Mr. Haddad was "limited use" immunity that only covered events in Oregon regarding Mr. Steitiye, as well as Agent Holden's statement in his affidavit that the immunity did not protect Mr. Haddad from "subsequent criminal wrongdoing."  (Def's Ex. A-12).

31.       On February 14, 2005, ATF Agent Brian Downey applied for and received a search warrant for

Mr. Haddad's residence.  Paragraph 5 of Agent Downey's affidavit supporting this search warrant reads:

> [i]n late 2001, a source providing information to law enforcement agents in Portland, Oregon, told the agents that HADDAD had sold a fully automatic AK-47 rifle (that is, a rifle that shot multiple bullets based upon a single trigger pull, or, in other words, a machine gun) to a suspect in a then-pending terrorism investigation.  The source also told law enforcement agents that the suspect later had rented a truck, had driven the truck to the State of Washington, and had exchanged the fully-automatic AK-47 rifle with HADDAD for a semi-automatic AK-47 rifle.  The suspect, a convicted felon, subsequently was arrested for illegal possession of firearms.  HADDAD has been interviewed concerning the transaction and told law enforcement agents that both rifles were semi-automatic, but that he and the suspect did discuss converting weapons to function fully automatically.

(Def's Ex. A-22).

32.     The ensuing search of Mr. Haddad's residence on February 15, 2005, led to the recovery of a 7.62 by 39 mm. SAIGA semi-automatic rifle that is mentioned in the indictment against Mr. Haddad, along with other weapons.

33.     In order to obtain the indictment against Mr. Haddad, Agent Downey testified before a Grand Jury in the Western District of Washington on October 20, 2005, regarding Mr. Haddad's statements made to federal investigators in 2003 about his relationship with Mr. Steitiye.  Agent Downey's statements to the Grand Jury reference information that Mr. Haddad gave to agents during his interviews with them on May 30, 2003, and October 30, 2003.

34.     After hearing this testimony, the Grand Jury authorized an indictment accusing Mr. Haddad of conspiracy to manufacture and deal in firearms under 18 U.S.C. §922(a)(1), 26 U.S.C. §5861(f), and 18 U.S.C. §2; converting a rifle to fire automatically under 18 U.S.C. §371; and possession of an unregistered firearm under 26 U.S.C. §5861(d).

## ANALYSIS

### I. The <u>Kastigar</u> Inquiry

The inquiry before the Court is the scope of the immunity agreement between the Government and Mr. Haddad.  The Government argues that Mr. Haddad was only afforded immunity for the statements he made to Assistant U.S. Attorney Atkinson and other investigators on November 14, 2003, and for statements Mr. Haddad made to the Grand Jury on December 15, 2003.  The United States contests that it could have provided immunity retroactively to Mr. Haddad.  The Government

1    also argues that only the U.S. Attorney's office for the District of Oregon was bound by the

2    agreement made between Mr. Atkinson and Mr. Haddad.  Mr. Haddad, on the other hand, argues that

3    he is entitled to immunity for statements made to Government agents on May 30, 2003, and October

4    30, 2003, in addition to his statements on November 14 and December 15 of that year.  He also

5    argues that this immunity should apply to federal prosecutors across the country–not just to those in

6    Oregon.

7        Under Kastigar v. United States, 406 U.S. 441, 453 (1972), immunity may be granted where

8    an individual would normally enjoy the Fifth Amendment privilege against self-incrimination, but is

9    compelled to testify by a Court order issued under 18 U.S.C. §§6002-6003.  In order for compelled

10   testimony not to violate the Fifth Amendment's protection against self incrimination, courts have held

11   that the breadth of the immunity granted must put the witness in the same position vis-a-vis law

12   enforcement as if he had taken the Fifth and remained silent. Id. at 458-59.  For this reason, the

13   immunity granted must encompass both use of the testimony itself, as well as any fruits derived from

14   the substance of the testimony. Id. at 453. Courts have generally held that an individual who receives

15   an informal promise of immunity from the Government in exchange for testimony can enjoy the same

16   breadth of immunity as someone whose testimony was compelled by Court order. United States v.

17   Dudden, 65 F. 3d 1461, 1467 (9th Cir. 1995). In making this inquiry, it is important for the Court to

18   remember that although the statements and investigative fruits derived from the testimony are

19   protected, the substance of the statements is not. United States v. Lipkis, 770 F. 2d 1447, 1450 (9th

20   Cir. 1985)(citing Kastigar, 406 U.S. at 453).  That is, if the Government can show affirmatively that it

21   obtained any evidence it plans to use from a wholly independent source, it may still use the

22   information in building a case against a Defendant, even if that Defendant happened to make an

23   immunized statement including that information. Id..

24       As with plea agreements, this inquiry is governed by contract principles.  United States v.

25   Irvine, 756 F. 2d 708, 710 (9th Cir. 1995); Dudden, 65 F. 3d at 1467.  The agreement between the

26   Government and the individual is to be given "a reasonable interpretation in light of the contract as a

whole and the surrounding circumstances." United States v. Plummer, 941 F. 2d 799, 803 (9th Cir. 1991)(citing Irvine, 756 F. 2d at 710-11). If an agreement is ambiguous, the ambiguity must be construed against the drafter, which is the Government in this case. Id. at 804.

**II.  The Immunity Agreement between Mr. Haddad and the Government is Ambiguous**

Both parties in this matter argue that the agreement between Mr. Haddad and the Government was unambiguous and that the Court need not look to extrinsic evidence to decide the scope of the agreement.  Upon independent examination of the written immunity agreement, however, it is clear to this Court that the agreement is drafted in an ambiguous manner giving rise to this dispute.

**A.  Inconsistent Use of Future and Past Tense Verbs and Use of the Phrase "Other Information" Renders the Agreement Ambiguous**

As cited above, the immunity letter in this case creates ambiguity through its use of several different verb tenses throughout the first paragraph of the letter.  The first line of the letter appears to cover, "information which will be provided by you to a grand jury and to law enforcement officers conducting an investigation regarding Ali Khaled Steitiye." (Def's Ex. A-1).  A reasonable person interpreting this language may read the use of the future tense as signifying that the agreement only extends to statements made in the future.  This is the view endorsed by the Government, who argues that even the November 14, 2003 statements were not covered by this letter, but by an oral understanding between the parties. However, just a few lines later the letter continues: "[n]o testimony or other information provided by you, or any information directly or indirectly derived from that testimony or other information, will be used against you in any criminal case, except in a prosecution for perjury or giving a false statement." (Id.)  A reasonable person could interpret this use of the past tense to signify that the letter also covered previous statements made by Mr. Haddad to law enforcement personnel.  This inconsistency creates ambiguity, which must be resolved by this Court.

Another area of ambiguity present in the immunity letter is the use of the phrase "other information."  The text of the immunity letter distinguishes "testimony" from "other information

provided by you to a grand jury *and* to law enforcement officers. . ." (Id., emphasis added).  The

letter promises that Mr. Haddad's testimony or other information will not be used against him in a

criminal case.  The unspecified use of the phrase "other information" is unclear in both of these

contexts and the Court can see how Mr. Haddad reasonably believed that this phrase referred to the

previous contacts he had had with federal agents on May 30 and October 30, 2003.  This is especially

so in light of the fact that his statements, for the most part, were substantially similar on these

occasions to the statements that he made on November 14, 2003 and his testimony to the Grand Jury

on December 15, 2003.

There are several legal considerations that also weigh in favor of adopting Mr. Haddad's

interpretation of the immunity letter.  First, as noted above, AUSA Atkinson drafted the immunity

letter on behalf of the U.S. Government.  Under common contract law principles, ambiguity is

traditionally construed against the drafter of a contract.  Plummer, 941 F. 2d at 804.  In the criminal

context, the public interest in important Constitutional rights, as well as the principles of fair play and

due process, virtually compel construing the agreement against the Government.  Other courts have

held that where plea agreements are at issue, "holding the Government to a greater degree of

responsibility" is appropriate because of the greater bargaining power and knowledge available to the

Government. United States v. Garcia, 956 F. 2d 41, 44 (4th Cir. 1992).

In this case, Mr. Haddad was unrepresented at the time of his negotiations for immunity with

the Government.  Although Mr. Haddad is a U.S. citizen and has lived in this country for a number of

years, he is not a native speaker of English and does not possess legal expertise.  Finally, Government

Agent McCartney testified that he had told Mr. Haddad as early as October 30, 2003, that the

statements that Mr. Haddad had made to federal investigators regarding Mr. Steitiye would not be

used against Mr. Haddad.  Agent McCartney also testified that this was his understanding of the

agreement that Mr. Haddad reached with AUSA Atkinson on November 14, 2003.

Although the Court recognizes that only U.S. Attorneys can bind the Government in an

informal immunity agreement, the context behind an agreement is important to understanding the

1    extrinsic factors that shaped Mr. Haddad's intent as he entered into this agreement. Lipkis, 770 F. 2d

2    at 1450.  Notwithstanding these factors, the Government has argued that retroactive immunity is an

3    anomaly and that this Court must not construe the agreement between the United States and Mr.

4    Haddad to apply retroactively.  To support this point, the United States cites Lipkis, which involved a

5    defendant who, like Mr. Haddad, gave statements to government agents on several occasions before

6    actually negotiating an immunity agreement. 770 F. 2d at 1447.  The Ninth Circuit denied Mr. Lipkis

7    immunity for statements made before he entered into the immunity agreement.  That case, however, is

8    distinguishable for two reasons.  First, Mr. Lipkis was represented by counsel at the time that he

9    made his immunity agreement.  His counsel, in contrast to Mr. Haddad, presumably understood that

10   he was entering into a limited agreement on his client's behalf.  Second, the court in Lipkis noted that,

11   "there was no evidence the United States Attorney intended to immunize [Mr. Lipkis' statements]

12   retroactively." Id. at 1450.  The Government tries to create a universal rule from this statement that

13   retroactive immunity can never be given.  Upon a close reading of this case, however, it seems that

14   the Lipkis court leaves open the possibility that retroactive immunity could be given in some cases

15   where the Government manifests an intent to do so.  Here, the Government's use of the past tense in

16   the immunity letter it gave to Haddad can be construed as a manifestation of intent to give him

17   retroactive immunity.  Under these facts, the Court finds that Mr. Haddad entered into the contract

18   intending that it cover not just the statements he would make to the Grand Jury, but also all previous

19   interviews he had granted to federal investigators.  The Government drafted the imprecise language

20   that gave him this impression and did not make affirmative efforts to disabuse him of this notion.  For

21   these reasons, it would be unfair to allow the Government to profit from Mr. Haddad's

22   misapprehension of the deal he made.

23        **B.  The Agreement Does Not Bind Only the District of Oregon**

24        The United States also argued briefly that the agreement at issue in this case was intended to

25   only bind the U.S. Attorney's Office for the District of Oregon.  The Court will not construe the

26   immunity agreement reached in this case so narrowly.  Under the Government's rationale, the

Western District of Washington, where Mr. Haddad is being prosecuted, would not be bound by the immunity agreement made by AUSA Atkinson in the District of Oregon.  At the hearing held on this matter, there was inconsistent testimony regarding whether or not Mr. Haddad had been warned that his immunity agreement only bound the District of Oregon.  While Special Agent Villegas' report includes representations that Mr. Haddad was warned that the agreement only covered Oregon, neither AUSA Atkinson nor JTTF Agent McCartney, who were both present on November 14, 2003, recalled making such a representation to Mr. Haddad. (Def's Ex. A-2, ¶9).  In fact, AUSA Atkinson testified that he contacted AUSA Hamilton of Seattle on November 14, 2003, to obtain his clearance for a grant of immunity to Mr. Haddad and to find out whether such a grant would interfere with the Seattle investigation.  If AUSA Atkinson had intended the agreement to only bind the District of Oregon, it is unlikely that he would have made this call.  There is also no clear geographic limitation present in the written immunity letter that Mr. Haddad signed. (Def's Ex. A-1). Finally, the case law supports interpreting the immunity agreement to cover other districts outside of the Oregon District.

United States v. Pellulo, 917 F. Supp. 1065 (D.N.J. 1995), involved a Defendant who entered into an immunity agreement in the Middle District of Florida.  As with the letter Mr. Haddad obtained, the immunity letter in Pellulo did not contain any reservation clauses geographically limiting the scope of the immunity the defendant received.  Id. at 1068.  Three years later, a Grand Jury sitting in Newark, NJ, returned an indictment against the defendant that was based, in part, on documents seized with a search warrant that was supported by statements that the defendant had made under the grant of immunity in the Middle District of Florida.  The Pellulo court held that the defendant in that matter was entitled to full immunity co-extensive with the Fifth Amendment and that the entire Government was bound by the immunity agreement–not just the Middle District of Florida. Id.

Looking specifically to the immunity letter in this case, the letter acknowledges that the agreement is between "this district" and Mr. Haddad. (Def's Ex. A-1). However, the letter also goes on to provide Mr. Haddad with, "all of the protection which would be provided to you under a formal court-ordered grant of immunity pursuant to the provisions of 18 U.S.C. §§6002 and 6003." (Id.).

1   Nothing in these statutes provides for a limitation of immunity to the district which granted immunity.

2   To impose such a limitation would undermine the important constitutional purpose of these

3   provisions to allow the Government the benefit of key testimony while ensuring an individual's Fifth

4   Amendment rights.  Accordingly, the Court finds that the immunity granted to Mr. Haddad was not

5   limited to the District of Oregon.

6   **III.  Remedying the Use of Immunized Statements**

7   Having decided that the immunity letter given to Mr. Haddad covers statements he made to

8   federal agents on May 30, October 30, November 14, and December 15, 2003, regarding his

9   relationship with Mr. Steitiye and that this immunity extends to all judicial districts in the United

10  States, the Court must now turn its attention to the issue of whether or not this immunity affects the

11  current indictment against Mr. Haddad in this District and, if so, what remedy is appropriate.

12  **A.  "Use" Immunity and Derivative Immunity**

13  As noted earlier, in order to be co-extensive with the protections afforded by the Fifth

14  Amendment, and 18 U.S.C. §§6002-6003, immunity granted for compelled testimony must

15  encompass both use of the testimony itself, as well as any fruits derived from the substance of the

16  testimony. Kastigar, 406 U.S. at 453.  This does not mean, however, that the Government is

17  precluded from using the substance of an immunized individual's testimony.  Rather, the Government

18  must show that it possesses a wholly independent source, apart from the compelled testimony, for

19  each piece of immunized information that it uses in prosecution of the individual who testified. Lipkis,

20  770 F. 2d at 1450.

21  **B.  The Government's Burden**

22  In this case, the Government has not met this burden.  The Court has noted that the United

23  States included references to the immunized statements that Mr. Haddad made on May 30 and

24  October 30, 2003 in the affidavit it used to obtain a search warrant for Mr. Haddad's residence.  The

25  Government has not clearly demonstrated that it had more than a suspicion that Mr. Haddad provided

26  Mr. Steitiye with arms before Mr. Haddad confirmed this fact to investigators.  This information,

conveyed in Agent Downey's affidavit, contributes significantly to supporting the probable cause that U.S. Magistrate Judge Benton found to authorize the search of Mr. Haddad's home on February 15, 2005. The evidence obtained from that search, as well as the testimony of ATF Agent Brian Downey regarding information conveyed by Mr. Haddad to federal agents during the May 30 and October 30, 2003, interviews, was then used to obtain the indictment against Mr. Haddad.

The Government argues that it could have obtained the warrant and the indictment without using the statements made by Mr. Haddad to Agents Stites, Conte, Villegas, and McCartney in May and October of 2003. However, it has not made an affirmative showing that it had independent evidence supporting the warrant and indictment that was as strong as Mr. Haddad's own admissions about his own activities in the gun trade. The Government urges the Court to "cut out" the immunized statements and derivative evidence from the affidavit and Grand Jury testimony to ascertain whether the remainder of the evidence supports probable cause for a search and, ultimately, the indictment. This is a questionable inquiry in the case at hand--especially where the Grand Jury indictment is concerned. It is unclear whether an allegation from an unnamed confidential informant that Mr. Haddad provided Mr. Steitiye with automatic weapons, along with the other statements in the affidavit regarding Mr. Haddad's alleged gun selling activities, would have by themselves provided sufficient probable cause on which to base the warrant for the search of Mr. Haddad's residence without inclusion of the information gleaned from the May and October 2003 interviews. Moreover, the Government has not provided this Court with solid authority regarding its ability to simply excise offending statements from the search warrant affidavit and Agent Downey's Grand Jury testimony.

The Government relies on United States v. Rogers, 722 F. 2d 557 (9th Cir. 1983), where the Ninth Circuit applied a harmless error analysis to immunized evidence admitted erroneously before a Grand Jury, which eventually returned an indictment leading to a conviction of the defendant in that matter. The Ninth Circuit in Rogers found that the untainted evidence presented to the Grand Jury was sufficiently substantial under the facts of that case to make the use of immunized evidence or

evidence derived from immunized statements superfluous. Id. 722 F. 2d 557 (9ᵗʰ Cir. 1983).  Mr.

Haddad's case, however, is in a different procedural posture from the Rogers case, which was on

review after the fact of that defendant's conviction.  The Rogers court specifically reserved deciding

whether or not suppression of evidence or dismissal of the indictment would be appropriate in that

case.  Id. at 561 n. 2.  By contrast, Mr. Haddad's case is in its preliminary stages.  Now is the time

for the Court to decide whether or not the Government's use of immunized statements to obtain a

search warrant and support an indictment against Mr. Haddad impermissibly taints evidence used by

the Government or the entire indictment and what, if anything, should be done to remedy such an

error. In making this assessment this Court strives to avoid error–even of the harmless variety.

        Having found that all of the interviews Mr. Haddad had with federal agents in 2003 fell under

the scope of the immunity agreement, the Court finds that use of information from these encounters

to obtain a search warrant and indictment violated Mr. Haddad's right against self-incrimination

under the Fifth Amendment.  Looking to the affidavit submitted by Agent Downey to obtain a search

warrant for Mr. Haddad's residence, key pieces of information supporting probable cause stem from

information Mr. Haddad gave to federal agents himself.  The other information in the affidavit

concerns an unnamed confidential informant and evidence regarding Mr. Haddad's activities at legal

gun shows.  Using this tainted affidavit to obtain a warrant, the Government was able to search Mr.

Haddad's house, where it found a number of weapons.  These weapons, however are derivative

evidence stemming from Mr. Haddad's immunized statements.  Without these weapons, or the

testimony of Agent Downey at the Grand Jury about Mr. Haddad's admissions regarding his dealings

with Mr. Steitiye, it is unclear to this Court whether Mr. Haddad would have been indicted.  Because

it is impossible for this Court to go back in time and "unring this bell" for the Grand Jury, the Court

must DISMISS the indictment against Mr. Haddad in its entirety.

                                    CONCLUSIONS OF LAW

        The Court finds that the immunity letter drafted by the Government and signed by Mr.

Haddad is ambiguous.  For this reason, the Court construes the ambiguity against the United States

and finds that Mr. Haddad's statements of May 30, October 30, November 14, and December 15, 2003, to government agents are immunized by this letter.  The Court also finds that the entire Government was bound by this letter–not merely the U.S. Attorney's office for the District of Oregon.  Because testimony regarding Mr. Haddad's immunized statements was used in the affidavit to obtain a search warrant for his house and because the evidence obtained from that search, along with his immunized statements, was introduced to the Grand Jury that indicted Mr. Haddad, the Court must DISMISS the indictment in its entirety for being tainted by immunized testimony and evidence derived from that testimony.

The Clerk of the Court shall direct a copy of this order be sent to all counsel of record.

Dated: April 6,  2006.

Marsha J. Pechman
United States District Judge

ORDER - 17